Frederik A. Jacobsen SBN 71330
email: fredjacobsen@earthlink.net
LAW OFFICES OF FREDERIK A. JACOBSEN
P. O. Box 2003
Menlo Park, California 94026
Telephone: (415) 483-2556

Attorney for Plaintiffs
Andrew Contasti, et al.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANDREW CONTASTI, ANNETTE CONTASTI and JOE HERNANDEZ, individuals, | ) ) ) ) | NO.    09cv1371-WQH (BLM) |
| Plaintiffs, | ) ) | AMENDED COMPLAINT FOR DAMAGES [42 U.S.C. § 1983]; DEMAND FOR JURY TRIAL |
| v. | ) ) ) | |
| CITY OF SOLANA BEACH, | ) ) | |
| Defendant. | ) ) ) ) ) | |
| _____ | ) | |

### Demand for Jury Trial

1. Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal

1   Rules of Civil Procedure and Local Rule 38.1.

2                           **Jurisdictional Allegations**

3       2.  This action arises under a federal statute, 42 U.S.C. §1983 (Federal Civil Rights

4   Act).  This Court has jurisdiction of this action under 28 U.S.C. §1331.

5

6                                    **Venue**

7       3.  Plaintiffs reside in San Diego County and the City of Solana Beach is located

8   within the Southern District of California.  All acts complained of occurred within the

9   Southern District of California.  Venue is proper pursuant to 28 U.S.C. §1391.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## FIRST CLAIM FOR RELIEF
### [Federal Civil Rights - 42 U.S.C. §1983 - Due Process]

3

4     4.  Plaintiffs Andrew Contasti, Annette Contasti and Joe Hernandez are residents of

5    San Diego County.  They own two adjacent lots (9 and 10), located at 360 North Granados

6    Avenue, in the City of Solana Beach.

7     5.  Defendant City of Solana Beach ("City") is a public entity organized and existing

8    under the laws of the State of California, and located within the Southern District of

9    California.

10

11     6.  Petitioners purchased Lots 9 and 10 in January, 2007.  At the time of purchase, the

12    two lots were improved with an aging church (the San Dieguito Mormon Church) built in the

13    1940's.

14     7.  The City regulated home building with a set of regulations, consisting of objective

15    standards such as building heights, building setbacks, and maximum floor-to-area ratios.

16    These regulations were made available to the public, and were intended to notify property

17    owners which property uses were permitted and what design features were required.  The

18    regulations also provided guidance to the City decisionmakers and limited the discretion of

19

20    those decisionmakers in approving permits for property development.

21

22     8.  The regulations in question provided for each of plaintiffs' two lots:

23     • single-family residential use was a permitted use  (Solana Beach Municipal Code

24    ("SBMC") §17.20.020 - "uses in the residential zones shall be as indicated in SBMC

25    17.12.020 (Use Regulation Matrix) Table 17.12.020-A)).

26     • one single-family residence per lot (SBMC §17.20.030B(1)(b) - "no lot shall be

27    occupied by more than one principal dwelling unit");

28

• minimum floor area (SBMC §17.20.030C - "each dwelling unit shall have a minimum gross floor area of 650 square feet");

• minimum yard setbacks (SBMC §17.20.030D - "minimum yard dimensions . . . shall be 25' for the front yard, 5' for the side yard(interior), 10' for the side yard (street), and 25' for the rear yard [Table 17.20.030D - Minimum Yards];

• maximum floor/area ratio (SBMC §17.20.030F - "maximum floor area ratio . . . shall be as follows: (.60 for the first 5,000 square feet of lot area.  (.30) for each additional square foot of lot area between 5,000 and 20,000 square feet");

• maximum height standards (SBMC §17.20.030G - "The maximum building height . . . shall be 25 feet . . .");

• height restrictions on retaining walls (SBMC §17.20.040O).

9.  Before purchasing the property, Contasti reviewed these local regulations, and spoke with representatives of the City's Planning Department concerning their application to the lots  he intended to purchase.  He advised City representatives of his plan to demolish the church structure and build single-family residences on each lot.  Specifically, Contasti attempted to learn how large a home he could build on each lot.  He was told that, given the size of his lots, he could build a home of approximately 4,000 square feet on each lot if the homes complied with the above regulations.

10.  Based on this investigation, Plaintiffs formed a reasonable expectation that City regulations allowed construction of two approximately 4000 square foot homes on Lots 9 and 10.

11.  Plaintiffs closed escrow after these discussions with City representatives, and purchased the two lots for $1.7 million.  Plaintiffs obtained one construction loan to build both

AMENDED COMPLAINT FOR DAMAGES [42 U.S.C. §1983]          -4-

1    homes. They immediately filed an application to demolish the church, and filed applications
2    for Development Review Permits and Structure Development Permits to build a 4,031 square
3    foot two-story dwelling on Lot 9, and a 4,387 square foot two-story dwelling on lot 10. Lots
4
5    9 and 10 are each approximately 8,400 square feet in size. The City found Plaintiffs'
6    applications to be complete on February 24, 2007.

7        12. In March, 2007, the Solana Beach Historical Society sought to halt demolition of
8    the church in the hope of obtaining a historical designation for the church building and
9
10   locating it elsewhere in the City. All of the City Council members were members of the
11   Historical Society. Instead of processing Plaintiffs' permits, the City delayed approval of
12   Plaintiffs' applications.

13       13. On April 18, 2007, the City Council instructed the City Manager to mediate a
14   meeting between the Historical Society and Contasti. This was the first notice that Andrew
15
16   Contasti was given of a claim that the church building was "historical." Although Contasti
     asked about the status of the Church building before his purchase, City representatives never
17
18   advised him of any basis upon which the Church building could be deemed "historical." In
19   fact, the old Mormon Church satisfied none of the City's criteria for historical designation.
20
21   Contasti was forced to hire an attorney to oppose the historical designation.

22       14. During an April 11, 2007 hearing on the historical status of the Church building,
23   the City's Mayor and a council member stated their desire to acquire Plaintiffs' property for a
24   community center, but noted that it was too expensive and that the City had no funds for
25   acquisition.
26
27       15. Thereafter, the Historical Society abandoned its attempt to relocate the church
     building, and a Demolition Permit was approved on May 30, 2007.
28

AMENDED COMPLAINT FOR DAMAGES [42 U.S.C. §1983]          -5-

16.  On or about July 1, 2007, the City noticed a public hearing on the applications for Development Review Permits and Structure Development permits for each lot for July 11, 2007.

**Treatment of Lot 9 Application**

17.  The July 11, 2007 staff report analyzed the proposed 4,031square foot home for lot 9 under the standards set forth in ¶8 above, and found the proposed home:

- consistent with the minimum lot size (§17.20.20.020 of the City's Municipal Code);

- consistent with the density requirement (§17.20.030B);

- consistent with minimum floor area (§17.20.030C);

- consistent with minimum yard setbacks (§17,20,030D);

- consistent with maximum Floor area ratio applicable to the LMRd Zone governing lot 9 at the time the project was deemed complete (February 24, 2007);

- consistent with maximum height standards (§17.20.030G);

- compliant with height restrictions on retaining walls (§17.20.040);

- consistent with permitted uses and structures (§17.20.020).

*18.  Staff recommended approval of the Lot 9 application.*

19.  At the July 11, 2007 hearing, the Mayor and City Council requested Contasti to reduce the square footage of the home proposed for Lot 9 by 230 square feet.  Contasti agreed at the hearing  to this reduction.

20.  After the July 11 hearing, Contasti submitted revised drawings for Lot 9, reducing the square footage for the proposed Lot 9 home by 256 square feet (instead of the Council-recommended 230 square feet).  The permits for Lot 9, based on these revised drawings, were approved by the City.

1

**Treatment of Lot 10 Application**

2

3       21.  A separate July 11, 2007 staff report likewise analyzed the proposed structure for

4    lot 10 under the same standards as for lot 9, and found the application:

5         • consistent with the minimum lot size (SBMC §17.20.20.020);

6         • consistent with the density requirement (§17.20.030B);

7         • consistent with minimum floor area (§17.20.030C);

8
          • consistent with minimum yard setbacks (§17,20,030D);
9
10        • consistent with maximum Floor area ratio applicable to the LMRd Zone governing

11   lot 10 at the time the project was deemed complete;

12        • complied with maximum height standards (§17.20.030G);

13        • compliant with height restrictions on retaining walls (§17.20.040);

14
          • consistent with permitted uses and structures (§17.20.020).
15

16       22.  *Staff recommended approval of the Lot 10 application.*

17       23.  At the same July 11 hearing, the City Council, notwithstanding the compliance of

18   the proposed Lot 10 home with all City regulations, indicated that it wanted the square footage

19   of the proposed home reduced.  However, the Council did not allow Contasti to agree at the

20   hearing to a reduction of the square footage for Lot 10 as it had for Lot 9.  Nor did the City

21   Council give Contasti any guidance about the amount of square footage it wanted reduced.

22   Instead, the City Council advised Contasti to "take his best shot" in submitting a reduced

23   square-footage home.  Contasti agreed to a continuance of the hearing to August 22, 2007.

24
         24.  Before the scheduled August 22 hearing, Contasti caused his project designer to
25
26   redesign the Lot 10 home by reducing the square footage by 258.25 square feet.  Revised

27   drawings reflecting this reduced square footage were submitted to the City.

28

---

25.  The August 22 hearing was continued to September 19, 2007.

26.  At the September 19, 2007 hearing, the City denied plaintiffs' proposed home on Lot 10.

**The City Resolution Approving the Lot 9 Home.**

27.  The City's July 11, 2007 Resolution 2007-108 supporting its approval of the home on Lot 9 made the following findings:

"The development complies with the following development criteria as set forth in Solana Beach Municipal Code Section 17.68.040F:

a.  Relationship with Adjacent Land Uses – The proposed single-family residence is designed in a manner that is compatible with other nearby development because the proposed use is the same as other nearby development and will have the same or similar operational effects as the other nearby single-family residences. The proposed development complies with the setback, height, and floor area ratio requirements established by the LMRd Zone and would be compatible with existing and potential future development designed to be consistent with the same development regulations. No adverse effects upon neighboring properties have been identified from this development. The surrounding areas are protected from potential adverse effects by the fact that the adjacent parcel to the south is being developed by the same applicant, public streets are adjacent to both the west and the north of the parcel and both required yard setbacks and a vertical elevation difference with the residence to the east provides an adequate buffer. These same factors provide protection of the property from adverse surrounding influences such as negative impacts to light, air and noise. [The same square footage comparison with surrounding properties as was done with

lot 10 is then set forth, noting that the residence proposed for lot 10 is 228.5 square feet greater than would be allowed under the later-adopted Ordinance 357]

b. <u>Building and Structure Placement</u> – The site layout and design of the proposed project, as conditioned, visually and functionally enhances its intended use as a single-family residence because the traditional architectural design of the structure is compatible with nearby structures, provides adequate setback distances from adjacent development to accommodate landscape screening and is consistent with the design and orientation of developments within the LMRd Zone.  The proposed development meets applicable development regulations such as setbacks, height and floor area ratio."

**The City Resolution Denying the Lot 10 Home.**

28.  The City's Resolution 2007-125 supporting the denial of the home on Lot 10 contrasts with its Resolution approving development of the twin Lot 9:

• "<u>Relationship with Adjacent Land Uses</u> – The proposed single-family residence is designed in a manner that is incompatible with other nearby residences because it is not compatible with existing or potential future single family development."

This ground for denial is both tautological and arbitrary because there is no reason given for alleged incompatibility with "nearby residences".

The denial proceeds to assert that "Adverse effects upon neighboring properties have been identified from this development."   No such adverse effects are identified, other than square footage comparisons with surrounding fifty-year-old properties.  The council concluded by finding that the proposed residence "is approximately 387 square feet larger than the maximum size of **future** residences in the area analyzed."   The alleged incompatibility of a

---

single-family residence in a single-family zoning district that complies with then-applicable maximum square footage limits is an arbitrary and unreasonable conclusion.  The reference to "maximum size of future residences" apparently refers to Ordinance No. 357.  As the planning staff noted: "The proposed project is not subject to Ordinance No. 357 **because it [the project application]was deemed complete prior to the ordinance effective date of March 24, 2007 (project deemed complete as of February 24, 2007).**"  To the extent that the City sought to impose a later-adopted ordinance to plaintiffs' application, the City acted arbitrarily and unreasonably.

• "Building and Structure Placement  – The site layout and design of the proposed project do not visually and functionally enhance its intended use as a single-family residence because the bulk and scale of the proposed project is incompatible with nearby structures." There is no definition of "bulk" and "scale" in the municipal ordinance, nor are those terms mentioned in the staff analysis of Lot 10. To the extent that "bulk and scale" are not defined by maximum allowable floor area, height maximums, and square footage maximums contained in the ordinance (all of which the plaintiffs' application satisfied), then those findings are arbitrarily vague and subjective and unreasonable.

29.  Plaintiffs' proposed home for Lot 10 conformed to **all** objective, non-arbitrary, and reasonable City regulation.  As the planning staff concluded: *All requirements have been met for the approval of the Structure Development Permit.*   The staff report went on:

"The proposed project, as conditioned, is consistent with all applicable requirements of the SBMC Title 17 (Zoning Ordinance, such as Permitted Uses and Structures(SBMC Section 17.20,020.  Further, **the proposed project adheres to**

all property development regulations established for the

LMRd Zone and cited by SBMC Section 17.20.030."

30. Plaintiffs' proposed home for (single-family residence) Lot 10 was compatible with the basic use authorized within their particular zoning and did not endanger the public health or safety or the general welfare of the area affected or the community as a whole.

31. The City's denial of lot 10 was done under color of state law, and proximately caused damage to plaintiffs, including but not limited to:

• lost profits on the development of the homes for Lots 9 and 10, which were to be developed jointly and jointly financed;

• carrying costs in an amount not yet determined;

• emotional distress to plaintiffs Andrew and Annette Contasti.

**Futility of variance.**

32. Solana Beach city ordinance §17.68.020(B)(3) provides:

"Variances may be granted in conjunction with conditional use

permits and development review permits; provided the findings

of subsection E are made.  Such variances **do not require a**

**separate application or a separate public hearing.**" [bolding

added]

33. At the July 11, 2007 hearing, the City Council effectively granted a variance for Lot 9 by allowing Contasti to reduce the square-footage of the Lot 9 home by 230 square feet. The Council ultimately approved Contasti's modified Lot 9 house, which actually reduced the square-footage by 258.5 square feet.  However, the Council did not approve a similar variance for the Lot 10 home at the July 11 hearing, despite Contasti's request.

34. Instead, the City Council at the July 11 hearing advised Contasti to "take his best shot" in submitting a reduced square-footage home for Lot 10. The Council refused, however, to provide any guidance to Contasti as to what square-footage it was contemplating. Contasti agreed to a continuance of the hearing to August 22, 2007.

35. Before the scheduled August 22 hearing, at considerable expense, Contasti caused his project designer to redesign the Lot 10 home by reducing the square footage by 258.25 square feet and drastically revising the exterior from a 'Tuscan Villa' look to a 'Craftsman' home style. Revised elevation and site plan drawings reflecting this reduced square footage were submitted to the City director of community development shortly after the July 11 hearing.

36. In response to this modified variant on Contasti's original proposal, the director of community development (who possessed the power under City ordinance to grant or deny variances), neither approved nor denied it. Instead, in his August 22, 2007 Staff Report, the director of community development changed his recommendation that the original proposal be approved (see, ¶ 22, *supra*) to a recommendation that the Council decide whether the revised proposal be approved, even though the revised proposal had been reduced in excess of 250 square feet. No explanation was given for this deleterious change in recommendation; the director of community development's analysis found that the revised proposal, like the original proposal, satisfied every adopted City standard governing the approval of new house construction (see ¶ 21, *supra*).

37. Having reviewed the Planning Director's abandonment of his previous recommendation to approve, Contasti attempted to set up a meeting after the August 22 hearing with two Council members [the California Brown Act prohibited his meeting with a

majority (3 or more) of the Council without a noticed public hearing].  Contasti wished to

discuss what changes in the Lot 10 home the Council wished to see in order to approve it.

Contasti's attempts were rebuffed.  No meeting with Council members occurred.

38.  On September 19, 1977, the Council denied approval to the Lot 10 proposed

house.  The Council made the following findings supporting its denial:

> "2(A)(1)(a).  <u>Relationship with Adjacent Land Uses</u> – The proposed single-
>
> family residence is designed in a manner that is incompatible with other nearby
>
> development . . . **Adverse effects upon neighboring properties have been**
>
> **identified from this development**." [Resolution 2007-125, bolding added]

City Ordinance §17.68.020(E)(4) governing variances requires:

> "That the granting of the variance **will not be** detrimental to the
>
> public health, safety, welfare, or **materially injurious to**
>
> **properties or improvements in the vicinity**." [bolding added]

39.  The Council's finding of "adverse impacts upon neighboring properties" legally

foreclosed the requisite finding to support the giving of a variance that Contasti's proposal

"not be detrimental" to "properties . . . in the vicinity."

40.  Further pursuit of a variance would have been futile because:

> • variances are typically granted for departures from objective development
>
> standards such as house height, yard setbacks, parking restrictions and the like.
>
> Contasti's proposed home for Lot 10 did not depart from, indeed conformed
>
> with, every City standard for lot size, floor-to-area ratio, height restrictions,
>
> permitted uses and structures, and many others as set for in ¶¶21, 36, *supra*.  In
>
> short, there was no departure from objective development standards in his

proposal from which to seek a variance;

• the City Council refused at the July 11 hearing to approve a variance for the Lot 10 home notwithstanding Contasti's request that the Council allow his proposed home for Lot 10 to be modified and approved as the proposed home for Lot 9 was;

• after the July 11 hearing, the Planning Director did not grant a variance for Lot 10's smaller square-footage home, instead removing his approval recommendation;

• after the August 22 hearing, and the Planning Director's actions, members of the City Council refused Contasti's requests to meet concerning what square footage would be acceptable;

• the City Council's September 19 finding that Contasti's Lot 10 home created adverse effects on neighboring properties made a variance not legally viable because local ordinance required a variance to be supported by a finding that the development not be detrimental to properties in the vicinity [City Ordinance §17.68.020(E)(4)].


## SECOND CLAIM FOR RELIEF
### [Federal Civil Rights - 42 U.S.C. §1983 - Equal Protection]

41.  Plaintiffs hereby incorporate paragraphs 1 through 40 by reference as though fully set forth herein.

42.  The proposed homes on Lots 9 and 10 were identical in all material ways, and the City's approval of one (Lot 9) and denial of the other (Lot 10) was discriminatory.  There was

1   no rational basis for this disparate treatment.

2      43. In addition, the City's approval of new homes in the immediate vicinity of

3   plaintiffs' property demonstrated the discriminatory treatment of the City's denial of the Lot

4

5   10 proposed home.  These approvals included, but are not limited to, the approval of homes

6   located at 140 South Granados (4,209 square feet), 142 South Granados (4,209 square feet),

7   and 146 South Granados (4,263 square feet).  These homes were approved in 2006, and were

8   identical in all material ways to plaintiffs' proposed Lot 10 home.

9

10     44. The City's discriminatory treatment of plaintiffs by denying their proposed Lot 10

11  home while approving like homes without a rational basis deprived plaintiffs of their right to

12  equal protection under the Fourteenth Amendment to the United States Constitution, thereby

13  violating the Federal Civil Rights Act (42 U.S.C. §1983).

14     45. The City's discriminatory treatment was done under color of state law, and

15  proximately caused damage to plaintiffs, including but not limited to:

16

17     • lost profits on the development of the homes for Lots 9 and 10, which were to be

18  developed jointly and jointly financed;

19     • carrying costs in an amount not yet determined;

20     • emotional distress to plaintiffs Andrew and Annette Contasti.

21

22

23

24

25

26

27

28

**PRAYER**

WHEREFORE, Petitioners/Plaintiffs pray for judgment against defendant City as follows:

1. For consequential damages according to proof.

2. For costs of suit arising from the prosecution of this action.

3. For reasonable attorneys' fees, expert fees and other reasonable expenses of litigation.

4. For such other, further and additional relief, alternatively and cumulatively, as the Court may deem appropriate in this action.

Dated: January 28, 2010                    LAW OFFICE OF FREDERIK A.  JACOBSEN


                                   By:   /s/ Frederik A. Jacobsen
                                         Frederik A.  Jacobsen
                                         Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of 18 years, employed in the County of San Mateo, and not a party to the within action; my business address is P. O. Box 2003, Menlo Park, California 94026.

On January 28, 2010, I served the within:

## AMENDED COMPLAINT

on the parties in said action, by electronic transmission via CM/ECF to the person(s) indicated below:

Steven E. Boehmer
McDougal, Love Eckis Smith Boehmer & Foley
460 North Magnolia, Drawer 1466
El Cajon, California 92022-2466

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 28, 2010, at Menlo Park, California.

/s/ Frederik A. Jacobsen
Frederik A. Jacobsen